STATE et al. v. NIX et al.
No. 13899.

Court of Civil Appeals of Texas. Fort Worth.

March 15, 1940.

Rehearing Denied April 12, 1940.

Gerald C. Mann, Atty. Gen., and Pat M. Neff, Jr., Asst. Atty. Gen., for appellant State.

Steve M. King, U. S. Dist. Atty., and John D. Rienstra, both of Beaumont, J. L. Backstrom, of Dallas, and B. W. Berg, of Washington, D. C., Sp. Attys. for Bureau of Internal Revenue, for intervener United States.

Wm. Madden Hill, of Dallas, for appellee Howard Dailey.

SPEER, Justice.

M. R. Ingram sued W. L. Nix, doing business in the trade name of Texas Refinery, and Heartfield Refinery Company, Inc., in a district court of Gregg County, Texas, for recovery on a note in the principal sum of $1,103.49, with interest at eight per cent per annum from its date, along with the usual and customary ten per cent attorney's fees, seeking a foreclosure of a chattel mortgage lien on six 250-barrel run down tanks, and one 1000-barrel storage tank, alleged to be a part of the equipment used in connection with a refinery. The note and mortgage were alleged to have been executed by Heartfield Refining Company, Inc., to plaintiff on May 11, 1933, and that the chattel mortgage lien was forthwith filed for record.

Further allegations are to the effect that subsequent to the execution and delivery of the note and mortgage, Heartfield Refinery Company, Inc., for a valuable consideration, sold and delivered to defendant, W. L. Nix, the mortgaged property, and that Nix assumed to pay plaintiff said indebtedness evidenced by the note.

Plaintiff's pleadings further show that the indebtedness is past due and unpaid, that demand has been made therefor and that Nix is insolvent. Other allegations state facts which, if true, would authorize the appointment of a receiver for the business operated by Nix.

Prayer was for the debt and foreclosure of the chattel mortgage lien and for a receiver; that a sale of the property by the receiver be ordered and that the proceeds of such sale be applied to the liquidation of plaintiff's debt and for general relief.

After notice, the court heard the application and entered an order appointing a receiver of the business operated by W. L. Nix, in which order, among other things, it is recited: "* * * And the plaintiff appearing by counsel and the defendant having appeared, and plaintiff having announced ready on his application; the court having read the verified oath of complaint and hearing the statement and admissions in open court, is of the opinion and finds that the same presents the proper case authorizing the appointment of a receiver, ex parte, and for granting the relief shown in this order." J. G. Strong was appointed receiver, his bond set and his duties defined.

The federal government, the State of Texas, and R. P. Ash intervened as creditors of W. L. Nix. Ash's claims consisted of two notes secured by chattel mortgages. The first note was for $1,750, dated April 27, 1933, with eight per cent interest per annum from date, and ten per cent attorney's fees, secured by a chattel mortgage lien on what was known as the Heartfield Refining Company plant (excepting the part previously mortgaged to plaintiff). Ash's second note was in the sum of $4,-651.86, dated September 19, 1933, with eight per cent interest per annum from date and attorney's fees, secured by a chattel mortgage on one 1500-barrel capacity Pipe and Still, Water Cooling Tower, Laboratory Building and Equipment, Pipe and Equipment in Water Well, 2000-barrel capacity bubble tower, Bath house and equipment, Office furniture, typewriter and filing cabinets. It was alleged these notes were both due and unpaid. Prayer in that intervention was for debt and foreclosure of the lien on the property described.

The State of Texas intervened under its claim for $28,870.16, due the State by W. L. Nix for taxes on motor fuel manufactured and sold, upon which the tax had not been paid under Article 7065a–1 et seq., Vernon's Civil Statutes, and for a foreclosure of its alleged first and preferred lien on all the property of W. L. Nix, including that described in plaintiff's and Ash's alleged chattel mortgages.

The United States, acting by and through W. A. Thomas, Collector of Internal Revenue for the Second District of Texas, intervened, made proof of and asked for judgment for its debt of $20,907.61 for taxes and penalties due on motor fuels manufactured and sold by Nix, for which no payment had been made. This intervener claimed and asked for a foreclosure of its first and preferred lien on all property of Nix, under and by virtue of Section 3466 of Revised Statutes of the United States, Section 191, Title 31 U.S.C.A.

Thereafter, on January 21, 1938, Howard Dailey was permitted by the court to intervene, as the sole plaintiff, under allegations that he had acquired all the rights in the subject matter theretofore held by the original plaintiff, M. R. Ingram, and intervener, R. P. Ash. An amended petition was at that time filed by intervener Dailey, alleging the indebtednesses and liens acquired by him, largely in the same language previously set out by Ingram and Ash. Further allegations were made that the receiver, theretofore appointed by the court, had, under orders of the court, sold the assets of W. L. Nix, doing business in the name of Texas Refinery, and had turned into the registry of the court (less costs and expenses incurred) the total sum of $7,466.92.

Prayer was for allowance of his indebtedness, that he be given judgment for the amount and that his claim and liens be decreed as prior and superior to all others of the parties, whether plaintiff, defendants or interveners, and that an order be entered directing payment from the funds in the registry of the court, for costs and general relief.

Interveners, United States and the State of Texas, renewed their pleas of intervention in much the same way as in their original pleadings, and further answered and denied that the substituted plaintiff, Dailey, was entitled to the relief sought. Each intervener insisting upon its respective rights and priorities theretofore pleaded.

Upon trial to the court, evidence was heard, about which there is little or no controversy under the issues involved here. Judgment was entered favorable to the intervening plaintiff, Dailey, as well also more favorable to the intervener, United States, than to the State of Texas.

The court found in his judgment that Dailey was the owner of the Ingram note originally sued on and of the two notes owned by Ash at the time of his intervention; that these debts were secured by liens on those parts of the assets of Nix, described in the respective mortgages; that said liens were first and superior as against

those asserted by interveners, United States and the State of Texas. There was a further finding that the asserted lien of the United States was prior and superior to that of the State of Texas.

The court further found that the property upon which Dailey held his first and superior lien constituted eighty per cent of all the assets of Nix coming into the hands of the receiver and sold by him; that out of the sum of $7,466.92 then in the registry of the court, so deposited by the receiver, certain parts thereof were the proceeds of operation and leasing of the refinery plant, and that $1,618.50 thereof represented the total sum for which the receiver sold said physical assets, and that said sale was the best that could be obtained by the receiver and had been approved by the court. That by reason of the fact that Dailey had a first and superior lien against eighty per cent of said assets, he was entitled to receive from the proceeds of said sale $1,294.-80 therefrom, and that the United States having a second lien on said property, it should receive the remainder of said total fund; that said remainder being insufficient to satisfy the United States tax and lien, there was nothing left with which to pay the tax debt and lien of the State. There was a further finding that by agreement of all parties the receiver was entitled to be paid from said fund $75 for services rendered, before either plaintiff, Dailey, or the United States should be paid any sum. The decree ordered paid from the fund in the registry of the court, (1) all costs incurred in the suit not previously paid by the receiver, including $75 to the receiver; (2) the claim of intervener Dailey in the sum of $1,294.80; and (3) the balance to the United States to be applied upon its judgment and claim for taxes. The decree further recites: "Inasmuch as the claim of the United States as allowed, is greater than the amount of money in the hands of the court, there will be nothing left to be applied on the claim of the State of Texas allowed herein."

The intervener, State of Texas, excepted to the rulings of the court. The United States excepted to that part of the judgment giving intervener Dailey a preference lien to that of the federal government, and both the United States and the State of Texas gave notice of appeal to the Texarkana Court of Civil Appeals. The State of Texas alone perfected the appeal, and by an equalizing order by our Supreme Court, the case is before us for review.

Appellant (State of Texas) presents this appeal, upon what we deem two propositions, although subdivided several times. They are (1) the trial court erred in holding that intervener Dailey's claim and lien were superior to that held by the State; and (2) the court erred in holding that the lien of intervener United States was superior to that of the State.

In appellant's brief it is said: "Consequently, the sole question for determination is whether or not the evident purpose embodied in Section 7, Article 7065 (a), R. C.S. is to be stricken down as violative of Article 1, Section 16, Constitution of Texas, and Article 1, Section 10, Constitution of the United States."

It is not claimed in this case that the taxes sued for by the State are ad valorem, but are occupation or excise taxes. If they were ad valorem taxes, then another question would arise, not now before us. Article 8, Section 15, State Constitution, Vernon's Ann.St., provides that the annual assessment made upon landed property shall be a special lien thereon; and that all property, both real and personal, belonging to a delinquent taxpayer, shall be liable to seizure and sale for payment of taxes due.

There is nothing in the record before us in this case which indicates that any part of the property upon which the tax lien is claimed by the State was real estate; it is described as personalty. The constitutional provision mentioned does not provide for a lien thereon to secure the payment of delinquent taxes, but only, that such property shall be subject to levy and sale therefor. The prior and preference lien asserted here by the State must depend upon the authority of the Legislature to make it such. This was attempted by the Act relied upon here.

The Act is contained in Art. 7065a, and at Section 7, among other things, provides: "All taxes, fines, penalties and interest due by any distributor to the State shall be a preferred lien, first and prior to any and all other existing liens, contract or statutory, legal or equitable, and regardless of the time such liens originated, upon all the property of any distributor, devoted to or used in his business as a distributor, which property shall include refinery, blending plants, storage tanks, warehouses, office buildings and equipment," etc.

It is earnestly argued by the State that such taxes, as those levied ad valorem, and as occupation or excise, are of equal dig-

nity, since they each go to support and maintain the State in all its sovereign functions. It reasons, that surely the framers of our Constitution did not intend that the Legislature could authorize the levy of a tax, such as the one under consideration, and then leave the State helpless as to a means of enforcing collection; that is, leave it optional with the taxpayer whether or not he would pay, or even permit another with whom he has previously contracted, to prevent the collection of such a tax. It is contended that in view of the vast amount of taxes accruing to the State under the Motor Fuel Act, to strike down the prior and preferred lien clause under Section 7 thereof would materially affect the taxing powers and revenues of the State derived therefrom.

In view of the contentions made by the State, we certified to the Supreme Court the two points involved. In response to our certificate, that Court answered our questions, in effect, as follows: (1) That the provisions of Section 7, Article 7065a, V.T.C.S., giving to the State a preferred lien, first and prior to all other existing liens upon all the property of the distributor, used in the business, to secure the payment to the State for the tax, did not violate the provisions of Article 1, Section 16, of our State Constitution; (2) that the trial court erred in holding that the claim of the United States for taxes, penalties and interest should be paid out of the funds in the registry of the court, before the similar claims of the State of Texas were paid. See opinion by Supreme Court, State et al. v. Nix et al., 133 S.W.2d 963.

The record discloses that all facts necessary to a determination of the rights of the several parties were thoroughly developed at the trial, and no necessity exists for further findings. Upon authority of the expressions found in the last above cited case and that of State v. Wynne et al. Tex.Sup., 133 S.W.2d 951, referred to by the Supreme Court in the Nix case, supra, the judgment of the trial court is reversed and here rendered that plaintiff take nothing and that the funds in the registry of the court be applied first to the payment of all costs not previously paid by the receiver and $75 stipulated to be due him for additional services rendered; and second, that the State of Texas have judgment against all parties to the extent of the remaining amount in the court's hands, to be applied to the payment of the tax shown

to be due it. Obviously there will be nothing left in the fund for payment to any other party. But under the holding in the Wynne case, supra, the classification of the respective claims would be that of the State of Texas, first, that of valid lien holders, second, and the claim of the United States, third. Judgment of the trial court is therefore reversed and here rendered, as above indicated.